Good morning. May it please the court? Time out. Our third case is 16-1464 Evanston Insurance v. Law Office of Michael Medved. Mr. Arguello? Yes, good morning. May it please the court? I'm Damien Arguello. I'm joined in the courtroom by Brad Levine as counsel for the Medved Law Firm and Mr. Medved. And Mr. Medved is also present in the courtroom. Your Honors, what we have here is a lawyer's professional liability insurance company whose conduct would frustrate the reasonable expectations of any lawyer in Medved's position, as well as violating Colorado law and the expectations that Colorado consumers and insurance regulators have of a liability insurance company. What happened here is that there were claims asserted against the law firm by class action plaintiffs that were inextricably intertwined and based upon the investigation of the Attorney General's Office, which also asserted claims against Mr. Medved. Evanston defended against the class action lawsuit purportedly under a reservation of rights, which was legally insufficient, and refused to defend against the interrelated action by the Attorney General's Office, which again, based on the common facts and legal issues involved, was error and it was in bad faith. Evanston stood on this distinction without a difference that between the two matters, one was not yet reduced to a formal complaint while the other one was. Moreover, after defending and settling the class action lawsuit for a nuisance amount of $16,000, and then at the last second when a draft complaint was finally submitted and the AG action finally agreeing to defend under a reservation of rights there, Evanston turns around and the very next day seeks to recover the cost of the defense in the class action lawsuit against Mr. Medved, arguing principally that the two matters don't involve professional services, because what happened here is that the fees and costs that Mr. Medved... Before we get to that, when do you assert the claim right that obligated Evanston to step in for the defense? With respect to the Donna lawsuit, the class action lawsuit, as soon as that... No, they provided the defense that are correct. Correct. I'm talking about the Attorney General's investigation. When did that claim ripen, you know, for purposes of the insurance policy? Well, from our standpoint, as soon as Evanston was aware that there was this regulatory action, if you will, by the Attorney General's office, that was... When was that? What's that? When did they become aware? They became aware of that very early on when even before Mr. Medved submitted subpoenas, the subpoenas to Evanston, when he mentioned it to them that first off, the Donna lawsuit was based upon this AG investigation. Now, right there, you know that you've got interrelated actions, and even if the AG action wasn't yet reduced to a complaint, in the good faith conduct of its investigation, Evanston should have explored the bases for both actions and should have been, you know, even if they didn't need to enter an appearance into, you know, a court matter at that point, defense counsel should have been assigned to be in perfecting that defense because, you know, as we argue, the insurer's duty to defend extends to these inextricably interrelated actions. To ignore one and let that brew, which could affect the outcome of the other, which is not good faith. Okay. Well, what case can you point us to that says before a claim is made that if the matter is inextricably intertwined with another matter in which a claim had been made, the insurer bears a duty to defend or indemnify for both? Your Honor, I can't point you to a specific case that addresses these exact circumstances. Or just generally that a duty to defend can be triggered because the matter is inextricably intertwined with another matter in which there is a duty to defend. Well, Your Honor, again, as a matter of general principle, the cases that we cited where you've got two actual lawsuits going on show that the duty to defend extends to both because the two actions do affect each other. Because there's two claims. Now, the problem here is that with the AG's investigation, there had been no written demand for money damages, which was the policy's definition of a claim. Right? Correct. And so I think that an obvious distinction between a situation where there have been two lawsuits in which there were claims in both matters that may be inextricably intertwined, here in the AG's investigation, all you have is a request for affirmation, a subpoena. You don't have a written demand for money damages. Isn't that a problem? Well, Your Honor, I think it's a problem in terms of formalities. But if you take a step back and look at what you're talking about when you're defending a claim, this is not just about appearing in court and asserting legal defenses. What you're trying to do is to eliminate or mitigate the insured's legal liability. And if you need to be proactive in order to do that, there are a number of cases out there, including one decision by a judge in the district court here in Colorado, in federal court, that say that also includes asserting affirmative claims on behalf of the insured, counterclaims, third-party claims, whatever is reasonable and necessary to defeat liability, that falls within the insurer's duty to defend. So even though we don't have an actual lawsuit that technically meets the definition of a claim in this matter, you've got the Donna lawsuit already existing. You know it's based upon the AG's investigation. You know that claim is going to come because the AG is asserting those claims against other mortgage law firms, like the Castle Law Firm. And so to stand on that formality in the broad context we have here, that's not advancing the insured's interest in defeating or minimizing liability. Would you make the same argument if the Donna lawsuit had not existed? In other words, all we have was the AG investigation. You think, I guess, the subpoenas would trigger the defense obligation under the policy? I guess my argument would be in that context, Your Honor, that at the very least the insurance company's adjuster should investigate the facts and circumstances around that investigation and begin preparing for that defense. And in my opinion, Your Honor, that is most effectively done by the adjuster signing counsel and working with counsel to begin to set up for that defense. So even though there's not a legal appearance required in court at that point in time, I think an insurance company in that situation acts most prudently when they do assign counsel and begin preparing to undertake that defense so they hit the ground running. That was a pretty careful answer. If I can read between the lines of your answer, you're suggesting, I think, that there may have been common law or statutory bad faith in failing to undertake a duty to defend, but I didn't hear you deny that if there had been the subpoena alone in the AG investigation, there would have been no duty to defend. Am I reading between the lines correctly? Well, I think, Your Honor, in the context of strictly reading the policy, that could be a defensible position. But again, I think the insurer's overall duty to the insured in this quasi-fiduciary situation that they find themselves in is to actively investigate and begin to prepare to protect the insured against liability. You may not know in that circumstance, as absent the Donna lawsuit, exactly what the AG's action is going to say, but you also know that these other law firms are being sued. That information is readily available to the insurance company, and they should reach out, find out what's going on. And even beyond that, going to your question about good faith, what we have here is not only Evanston failing to defend the law firm, but actively attacking it, including in briefs in this Court, by basically saying, we don't insure for fraudulent conduct. Well, as we know from the outcome of the Castle case, you know, the Castle firm won its case basically outright except for one issue that doesn't involve Medved, which was an ownership interest in the posting companies. Had Evanston done that, they would have understood that there was no fraudulent conduct. There's no intentional conduct here. Medved would have had a good chance of defeating the AG's action, as the Castle law firm did, which is really demonstrated by the fact that the Castle law firm collected its attorney's fees based upon Judge Hoffman finding that it was a frivolous lawsuit. Do we have anything in the record about what happened in the Castle lawsuit? Your Honor, we did submit, I believe, Judge Hoffman's opinion as part of our appendix. So I believe the Court can take judicial notice of that. I don't think we've submitted his opinion on the attorney's fees. And am I correct that in district court, in your response to the summary judgment motion, you never argued anything about bad faith? No, I don't think that's correct, Your Honor. What pages of the response brief in district court did you discuss the bad faith claim? Well, I think, Your Honor, we mentioned in the context of talking about the stress con action, I don't think we developed our arguments about bad faith as much as we should have. But I would submit that the district court's decision as to bad faith is ultimately moot and reversible if this Court decides, as I believe it should, that there were professional services involved here. Unlike in the O'Hara case where you've got a medical provider billing to Medicaid as really a courtesy to the patient, here part and parcel of what the MedBed firm was doing was seeking to perfect the right to recover these costs from borrowers or others who would purchase these properties out of foreclosure. So part of what the MedBed firm is doing here is not just billing as a courtesy against third parties, as in the O'Hara case, but it's actually protecting its clients' legal rights. Part of what they do is to get these costs back in the foreclosure process. That's a professional service, as were a number of the other things that the MedBed firm was doing here, like selecting posting companies, deciding on the appropriate title policies. All of these things involve legal judgment and legal rights. So this is a distinguishable situation. So ultimately, especially when you look at the broadening language of the policy, you've got a professional service at the core of this. If you didn't have the... And what is the amount of the bill, though, having any relationship to professional judgment? I'm sorry, Your Honor? The amount of the invoice that was submitted. Well, what... I mean, that doesn't require, you know, professional skill. That's just an accounting... Well, I think it involves a couple of things, Your Honor. I mean, first off, the allegations here are that the amounts of these bills violate various laws, and certainly the MedBed firm in setting its pricing needs to be aware of that fact, that it shouldn't be charging fees or costs that are exorbitant and would ultimately violate those laws. So that aspect of it certainly does. But again, we wouldn't have this lawsuit if there wasn't an attempt to recover these costs from third parties. This isn't MedBed's clients complaining about the amount of the bill or that the amounts were incorrect. It's these third parties, the Attorney General and these borrowers, who are saying that these practices were incorrect. But nobody is complaining. I understand your argument, but nobody's complaining about what Mr. MedBed did or did not do with regard to the public trustee. For example, with regard to the postings. I think the claim in both the Donnell lawsuit and the AG is that Mr. MedBed, for example, didn't charge the market rate of $20 per posting, but charged $125. And so if that is the underlying wrongdoing that is alleged in the Donnell lawsuit by the Attorney General, going back to the Chief's question, what does that have to do with charging $125 per posting instead of $20? What does that have to do with professional judgment or professional services? Well, as I said, Your Honor, part of what Mr. MedBed has to do is set his pricing in a way that, in the context of what he's doing, is not going to violate the law. The context of what he's doing here is seeking to recover those costs, making it possible for those costs to be recoverable by his clients. If that activity wasn't the case. His purpose in billing is to recover his own expenses, his own charges. It may be related to, I mean, yes, the underlying billing is for services, but how do you make a bill that is overcharged about professional services? I don't get it. Well, again, Your Honor, the policy doesn't say that the lawsuit has to allege that there's a wrongful act in conducting professional services. There's this broadening language. It's by reason of or, you know, if you will, arising out of. There just needs to be a causal connection. By reason of a wrongful act in the performance of or failure to perform professional services. Again, there's no causal chain here. The billing is an independent act of those professional services. So I don't think the by reason of language gets you there. Well, I would submit, Your Honor, as well, that if we're talking about causation, that also would be something that is up to the jury. Was there a causal connection between the foreclosure practices that the firm was undergoing and the complaint about the bills being too much? And without these third party lawsuits, these third parties claiming that this was a wrongful act, that there was a misdirection, a deception, misrepresentations going on, you wouldn't have this action at all. So I would submit, Your Honor, that there is a causal chain there. That would be up to the jury to decide. Thank you. Thank you, counsel. Let's hear from Evanston. Ms. Cogar. Good morning, Your Honors. May it please the Court. I'm Courtney Cogar. I'm here on behalf of Evanston. And we are asking this Court to affirm the summary judgment that was entered below. This case arises out of a dispute over what Evanston's obligations were under an insurance policy. The place to start that determination is to look to what the insurance policy obligated Evanston to do. What MedVed wants it to do is to pay back or cover him for discouraging ill-gotten gains based on potentially or allegedly fraudulent or dishonest activity. But what the policy actually says is that Evanston will pay damages as a result of a claim by reason of a wrongful act in the performance of or failure to perform professional services. And when you pick that apart a little bit, it is MedVed's as the insurer's obligation to bring a claim within the insuring agreement of a policy. So there have to be damages, which is a defined term. Damages does not include penalties. Damages does not include punitives. Damages does not include anything that's uninsurable as a matter of Colorado law. Then Mr. MedVed has to show that those damages are sought as a result of a claim. And as the Court has already acknowledged, that's a very clearly defined term in the policy, a written demand for monetary damages. That claim has to be by reason of a wrongful act. Wrongful act is a defined term. It's defined to be an act or error or omission in the performing of or failure to perform professional services. Professional services is a defined term. It's services performed by the insured for others as a lawyer. So both the DANA complaint and the AG complaint, when it was ultimately filed, when it actually became a claim, would have to fall within each and every one of those before there could be any duty to defend. And if there's no duty to defend, there can be no duty to indemnify. So that's where we would start. When did the claim arise, if ever, or vis-a-vis the Colorado Attorney General matter? As best as Evanston could determine, after multiple requests, there was no written claim for money damages until the draft complaint provided by the Attorney General to Mr. MedVed's then counsel was made. So you're saying that's the requisite written demand that triggers I.M. coverage? Yes, Your Honor. Apparently there were oral discussions, but there was nothing written, and certainly nothing written ever given to Evanston to review and consider, despite repeated requests for it. Well, you know, these type of investigations, you know, not just Colorado, but the feds, you know, they'll sit on written demands until they develop a case, and then it's all packed together and dropped. Under your theory, then there would be really no coverage until very late in the game when, you know, the investigation's already more or less been completed. If the agency doing the investigation never makes a written demand for money damages, then no, there is never a claim. There's a very easy way around that, and we see it in practice all the time, at least in not necessarily A.G. investigations. Right. And that is to say the defense lawyer or the coverage lawyer says to the plaintiff's counsel or the Attorney General, hey, I want to tender this to my insurance company, but they've said there's no written demand for money damages. And an e-mail comes out within 30 seconds saying, we demand payment of, you have a claim. So that would trigger a claim, but it was never done here. Right. Evanston kept saying, send us information, send us the draft complaint you've talked about, send us the complaint that you've talked about against the Castle firm or the, is it Aronowitz, the other firm, so we can look at it, so we can determine. But Colorado is a four corners of the complaint state. That's what you look to to determine the duty to defend, and Evanston couldn't get the claim or the complaint to make that determination. One way to read the policy, correct me if I'm wrong, is that once a claim is made that some of the expenses that had been incurred prior to that, investigatory expenses might be reimbursable, assuming there's coverage? Typically not if it was incurred prior to tender, Your Honor. I have seen Evanston, in fact, pay defense costs that were incurred between tender and the date that they accepted defense under a reservation of right or accepted coverage. But here, for example, you have that AG complaint. It served in January of 2013. Mr. Medved clearly didn't think it was a claim under his Evanston policy because he didn't send it to Evanston or ask Evanston to do anything about it until after the Donna lawsuit gets filed in September or October. So he sat on it for months. He incurred expenses responding to that subpoena without ever giving Evanston any opportunity to consider. So those would certainly not ever be reimbursed by Evanston. If the Donna lawsuit is more or less functionally the same as where the AG is going, why wouldn't they reasonably assume that, well, if one is covered, the other is covered? They're slightly different, Your Honor. The Attorney General – number one, they're different claimants. Number two, they're not brought as the same proceeding. You don't see the Attorney General moving to enter as a plaintiff in the Donna lawsuit. Number three, they're seeking slightly different relief. The Attorney General is out there seeking civil penalties or damages to restore individuals to their proper – to as they were before.  I mean, what matters is whether this arises out of the performance of professional services. If it arises out of the performance of professional services, if it seeks damages that are covered by the policy, if it's not all uninsurable civil penalties. So, for example, the AG is empowered to seek civil penalties. Those aren't damages. They can also seek restitution or reimbursement of consumers, though, also, couldn't they? That is true, Your Honor. That is covered, assuming we have professional. Well, that would be disgorgement of proceeds that Mr. Medved was not properly entitled to. And there's plenty of case law cited in the briefs that that kind of restitution, which is what both the Donna plaintiffs and the AG ultimately sought, are to disgorge profits from ill-gotten gains. Those are not damages either. And you raise that as an additional reason for denial of the claim? Yes, that was raised. It was not addressed by the district court because the district court stopped at performance of professional services. There were a number of other arguments that were briefed in the summary judgment briefing. And I just heard counsel in the previous argument say the court can affirm on any reason that's properly before it. So we would argue that the court could look at those additional defenses that were properly raised and briefed. New arguments, which Mr. Medved has presented here this morning, should not be considered. And this court has routinely said it will not reverse a district court based on evidence not before it or an issue not raised below. So we would ask the court not to consider the evidence that was not properly before the district court. And we would ask the court not to consider this new argument that came up in the appellate brief for the first time that, oh, this is professional services because we were trying to protect our client lender's rights to recover. That's not argued. I was not involved at the summary judgment stage, but I went and scrutinized the record when I realized I was going to be here talking to you this morning about the appeal, and I can't find it in the record. It's not in the summary judgment briefing. I hate to return you back to the earlier topic that you were discussing with Chief Judge Timkovich, but with regard to a claim, would a letter, say, an e-mail or a letter from the Attorney General saying, we'll settle our dispute with you, Mr. Medved, for a million dollars, would that constitute a written claim for money damages or a written demand for money damages? I believe that that probably would be deemed a claim, Your Honor. And there were e-mails about that that preceded the settlement, I assume. Not that we've ever seen, including through discovery. So all of the settlement negotiations were oral? That's my understanding. There are some e-mails about when can we meet or we're going to evaluate something and get back to you, but they're not about pay us a million dollars to settle this claim. If there was one, Judge, it's still not out there. It hasn't been produced in discovery, much less turned into Evanston. Well, maybe, let me ask you this. Would there have been a reason for Mr. Medved not to think that it mattered to give, if there were such, let's say hypothetically that there were such, at least one e-mail to that effect. I think earlier, several minutes ago, you had said that Evanston had told Mr. Medved, look, if there's a complaint, if there's a draft complaint, give it to us. What I didn't hear you say and what I didn't read in your briefing, in district court or here, was if there is any written demand for money damages. For example, if the Attorney General ever asks you for money or offers settlement, give that to us. And so your adversary, Mr. Medved, has argued, well, of course they didn't give you any of these e-mails with regard to a written demand for money damages because you all had made it very clear to Mr. Medved that you didn't care about anything like that, even though you just acknowledged that that very well could constitute a claim, because what you were narrowing your insistence to Mr. Medved was for a complaint. So maybe there were e-mails. And maybe they just had no reason to give that to you because you all obviously weren't interested in those because you were confining your interest to a complaint. I don't believe that's completely factually accurate, Your Honor. I know there was at least one letter saying any correspondence or letters with the Attorney General's office. That goes beyond complaint. There was a teleconference with Mr. Medved's coverage counsel, who were well aware of what the definition of a claim was and were trying to, or at least they said they were trying to provide evidence to show that there was a claim that would trigger coverage. So I believe there is adequate information out there for Mr. Medved or his then-coverage counsel to know, hey, we should send these e-mails over because they're saying they need a complaint to evaluate. It is true you have to evaluate a complaint to go forward, but they simply never got to the point of sending a complaint or even a claim. And until you have a claim, you don't trigger any of that. So, Your Honors, unless the Court has any questions. I want to turn to your argument on the professional services. Yes, sir. I think we got diverted on that. Yes, sir. The professional services, the definition that typically gets tossed around is the marks definition, and it was from Nebraska, an older case, and it talks about how it has to be services that arise out of specialized knowledge or training, out of an occupation or a vocation. It's predominantly mental rather than physical labor. Mark's definition, arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill is predominantly mental or intellectual. And I believe this Court actually has referred to that in that O'Hara case, which was discussed a little bit earlier. That's the one where it was doctors, and they were submitting fraudulent billing to Medicare and Medicaid, and when they got sued, they sought insurance coverage from Zurich, and they said, well, this wasn't really about billing. This was about we didn't provide the nursing services, and this Court said, oh, no, this is about the bills you submitted, and bills are not professional services. And if you want something that's directly from Colorado. Well, wasn't there a policy language in this case defining the term professional services, and wasn't it narrower than the definition, or perhaps vaguer than the definition that you just gave us? Well, the definition of professional services is services performed by the insured for others as a lawyer. Isn't that quite a bit broader than the language from the case that you just cited? Your Honor, I don't. And shouldn't we use this definition when the policy provides it? Yes, absolutely, Judge. We use the definition in the policy, and frankly, it's narrower, because it specifically limits professional services for this policy to services rendered as a lawyer. So it doesn't go any broader than a lawyer's professional services. And why aren't these billing services, as Ms. Eriqueo argued, you know, part of their professional conduct for their lender clients? That's where we look to the Cohen case, which is the Colorado Court of Appeals. And that was a case where factually it was a lawyer who had retained another lawyer to assist him on a claim or a case, and then he didn't pay the other lawyer. And there was a dispute over whether that failure to pay the other lawyer was part of the professional services of prosecuting the case or not. And the Colorado Court of Appeals said no, that's incidental to the business. Things like having a secretary or hiring staff or business expenses, those are not professional services. They're not incident to the professional services. They are incidental to maintaining a business. So I think we fall within the Cohen category, Judge. These are incidental to collecting amounts, which were for the med-bed firm. They were going to be paid by the client or by the homeowner who's curing a default or by the ultimate purchaser who buys it from the bank after the bank forecloses. Your Honor, I am out of time. If there's anything else the Court would like. Well, just to finish up on that, why isn't it more analogous to recovering, you know, costs that a law firm incurs in, you know, filing fees for their complaint and things like that? I don't – Your Honor, they're simply billing the wrong amounts. They're putting in $120 or $125 for something that costs $25. That's not simply recovering a cost that's incurred. That's submitting a bill for a cost that, frankly, wasn't incurred. But it's not part of the professional – doesn't require professional judgment. It doesn't require a vocation. It's not services as a lawyer. It's the lawyer seeking to get paid. And then the fact that those costs may be passed on to a homeowner seeking to cure or to the lender who forecloses and then recovers them ultimately from the eventual purchaser of the property, that's irrelevant. It's still simply the med-bed law firm seeking to get paid. Thank you, counsel. Thank you, Your Honor. Let's see. Thank you very much.